Selden, J.
If, to sustain the defence in this case, it was necessary to show that the plaintiffs had agreed to manufacture these saws for a specific purpose, and that, when tried, one or more of them proved not to be adapted to or useful for that purpose, then the rulings of the judge upon the trial may have been right. Such a contract would be entirely different from an ordinary sale, with a general warranty of quality, and would require to be specially stated; but, on the other hand, if, upon every sale of a manufactured article by the manu *596 facturor himself, there is an implied warranty that the article sold is free from any latent defect growing out of the process of manufacture, *tlien the cause should have been submitted to the jury upon the evidence given. It is not necessary, in pleading, where a party relies upon a mere general warranty of the quality of goods sold, to state whether the warranty is express or implied; a general averment that the vendor warranted the articles to tie of a good quality, is sufficient; proof of a warranty of either kind will support the averment. In the view I take of this case, therefore, it is only necessary to consider whether, upon a sale by a manufacturer, of articles manufactured by himself, he impliedly undertakes that such articles are of fair quality, and have no secret defect arising out of the manner in which they were manufactured.
It may not be possible to reconcile all the decisions upon the subject of implied warranties upon the sale of goods; but if we keep steadily in view the principle which lies at the basis of all such cases, we shall find that much of the apparent conflict will disappear. It is a universal doctrine, founded upon the plainest principles of natural justice, that, whenever the article sold has some latent defect, which is known to the seller, but not to the purchaser, the former is liable for this defect, if he fail to disclose his knowledge on the subject, at the time of the sale. In all such cases, where the knowledge of the vendor is proved by direct evidence, his responsibility rests upon the ground of fraud. But there are cases in which the probability of knowledge on the part of the vendor is so strong, that the courts will presume its existence, without'proof; and in these cases, the vendor is held responsible upon an implied warranty. The only difference between these two classes of cases is, that in one the scienter is actually proved, in the other, it is presumed.
It is obvious, that the vendor of goods would be very likclv to know whether he has a title to the goods he *597 sells; lie knows the source from which such title was obtained, and has, therefore, means of judging of its validity, which the purchaser cannot be supposed to have. Hence, it is the doctrine, both of the civil and the common law, that every vendor impliedly warrants that he has title to what he assumes to sell.
*Some slight doubt has been supposed to be thrown upon this doctrine, in England, by the remarks of Parice, B., in the case of Morley v. Attenborough (3 Exch. 500). It is, however, too well settled, both in England and in this country, to be overthrown or shaken by the obiter dicta of a single judge. My object is not to establish this doctrine, which admits of no doubt, but simply to show that it rests upon the foundation here suggested, viz., the presumed superior knowledge of the vendor in regard to his title. The case of Morley v. Attenborough itself tends, in my view, to confirm this position. It arose upon a sale, by a pawnbroker, of a harp pledged with him as security for a debt; the sale was made through auctioneers, and a general catalogue was furnished to the bidders, which “stated on the title page, that the goods for sale consisted of a collection of forfeited property.” The court held, that there was no implied warranty of title in that case. There was, perhaps, good reason why this case should be considered an exception to the general rule; the pawnbroker could not justly be presumed to have any special knowledge in regard to the ownership of the articles pledged; the probability was, that he had received them upon the faith of the pledgor’s possession alone, and the purchaser was, in this respect, upon an equal footing with himself.
There are other exceptions to the general rule, which have the same tendency: the «case of judicial sales is one. There is no ground for presuming that the officer of the law has any peculiar knowledge on the subject of the title to the property he exposes to sale. No doubt, both the pawnbroker and the officer, if shown to have knowl *598 edge which they conceal, would be liable for fraud; or, if tney could justly be presumed to have such knowledge, would be liable upon an implied warranty. It was expressly neld in the case of Peto v. Blades (5 Taunt. 657), that the law raises an implied promise on the part of a sheriff, who sells goods taken in execution, that he does not know that he is destitute of title to the goods.
A very ancient and leading case on the subject of implied warranty of title, viz., Cross v. Gardner (Carth. 90), shows the Aground of liability to be that here suggested. There, the plaintiff sought to recover against the defendant for selling a pair of oxen as his, when they in truth belonged to another. It was objected, that the declaration neither stated that the defendant deceitfully sold the oxen, nor that he knew them to be the property of another person; but the court held the defendant liable, because the plaintiff had no means of knowing to whom the property belonged, but only by the possession. This plainly implies that the defendant had better means of knowledge; and upon this presumption-the court evidently proceeded. That this was the foundation of the decision, appears also from another report of the same case (1 Show. 68), where the ground taken was, that, “ if a man, having possession of goods, sell them as his own, an action lies for the deceitNow, deceit implies knowledge, and as no knowledge was proved, it must have been presumed.
In an older case still, viz., Dale’s Case (Cro. Eliz. 44), the court decided, by two judges against one, that the action would not lie, because there was no allegation, or proof, that the defendant knew of the defect in his title; but, to use the language of Croke, “Anderson contra, for it shall he intended, that he that sold had knowledge whether they were his goods or not.” -The ground here taken by the dissenting judge, that every vendor is presumed to know, whether he has title to the things he sells, is precisely that upon which the subsequent cases have *599 proceeded, and one which affords a solid basis for the doctrine of implied warranty of title.
It is equally clear, that implied warranties in respect to quality, wherever they are held to arise, rest upon a presumption, in the particular case, that the vendor knew of the defect. It is easy to see, that, in respect to all that class of personal chattels which do not enter extensively into the business and trade of a people, aiid which do not pass rapidly from hand to hand, such as horses, cattle, furniture, and the like, the vendor, who, in most cases, would have ■ had the article for some time in possession and use, would be very likely to.know whether it was defective, and a presumption of knowledge would, in *such cases, as a general rule, be both reasonable and safe. On the other hand, with regard to those goods which are the subject of general traffic, and are habitually purchased, not for use, but to be sold again, no such presumption could fairly arise. This distinction may serve to account, in some degree, for the difference between the civil and the common law rule upon the subject of latent defects in articles sold. The rule of the civil law, caveat venditor, was adopted at an early period, and in reference, as it would seem, rather to those articles which are of general and ordinary use, than to such as enter extensively into the commerce of the country; while that of the common law, caveat emptor, originating in a commercial age, and among a highly commercial people, naturally took the form best calculated to promote the freedom of trade. No doubt, the common-law rule is, upon the whole, wisest and best adapted to an advanced state of society; and yet, there is a large class of cases in which that of th’e civil law would serve to prevent a multitude of frauds. Take, for instance, the article of horses. Few would deny that, as to them, it would be more conducive to justice, if the vendor were, in all cases, held to rvarrant against secret defects; but, as it would be impracticable to *600 discriminate among the infinite variety of articles which are the subjects of sale, the common law applies the maxim caveat emptor, as á general rule, to all cases.
It has been frequently, but, as I apprehend, inaccurately, said, that under the civil law a warranty is implied from the payment of a “ sound price ” for the article sold. Although paying a “ sound price ” may prove that the purchaser was not, it does not prove that the vendor was, cognisant of any defect; it can, therefore, have no tendency to show which of the two parties ought to bear the loss. Where, however the price paid is less than the value of the article, supposing it to be sound, this shows that the purchaser was apprised of the defect, and that the parties contracted with reference to it; in such cases, therefore, no warranty arises. It is in this aspect alone, that the price paid becomes of importance. But because the want of a “ sound price ” would thus prevent a warranty, it has been Hllogically inferred, that the payment of a “ sound price ” was the foundation of the warranty. The truth is, that the civil law raises the warranty, because it presumes knowledge on the part of the vendor ; and the. want of a “ sound price ” prevents a warranty, because it proves equal knowledge on the part of the vendee.
The theory of- the civil and of the. common law, in respect to these implied warranties, is entirely different. The civil law holds, that the warranty enters into and forms an integral part of the contract of sale itself, as will be seen 'by referring to Pothier’s definition of a sale, and his statement of the obligation of the vendor to warrant against latent defects, which he deduces directly from.that definition. The definition he gives seems to be somewhat strained for the purpose of embracing' that obligation. (See Pothier on Cont. of Sale, Prelim. Art., and Part II., chap. 1, § 4.)
But the common law, with, as I conceive, better logic, derives the obligation from the general doctrine which *601 Holds vendors responsible for every species of deception. That this is the true source of this warranty, at the common law, will be rendered apparent, by reference to three early cases, two of which have been already referred to; viz: Dale’s Case (Cro. Eliz. 44); Furnis v. Leicester (Cro. Jac. 474); and Cross v. Gardner (Carth. 90; s. c. 1 Show. 68). These cases show by what gradations a strong principle of justice overcame, at length, the technical rules of the common law, and forced the courts to sustain an action for a deceit, without any averment or actual proof of wilful deception.
It is possible to read, even in the" meagre record we have of these three cases, the mental operations of the pleaders, at that remote period, in framing the respective declarations. They were all experimental cases, and probably enlisted the highest legal talent. The declaration in Cross v. Gardner, as we know, was drawn by Mr. Justice Gould, of the King's Bench; this we learn from himself, in Medina v. Stoughton (Lord Raym. 593). The object of the pleader, in each case, evidently was, to avoid the necessitj^ of alleging a scienter, of which he has no extrinsic '""proof. In Dale’s Case, there was no averment, direct or indirect, on the subject of knowledge, and the experiment failed; the pleader having taken too great a stride to begin with, but carrying along with him, nevertheless, one-third of the court. In Furnis v. Leicester, the word “deceitfully,” which implied knowledge, was ventured upon, relying upon the presumption of knowledge to support it; and this experiment succeeded. In Cross v. Gardner, another step was taken, and a colloquium, and averment of possession in the plaintiff were resorted to, instead of any allegation of knowledge; in this, also, the pleader was successful.
These are the cases, especially the last, which established, in the English courts, the doctrine of implied warranty of title; and my object in referring to them is, to sustain the position I take, that the rule was originally *602 based upon the presumption that a vendor knows whether or not he has title to the things which he sells. That this was so, is manifest, from the kind of declaration used in all these cases, viz.,' case for deceit. Precisely when the form of action was changed, from case to assumpsit, does not appear; but it certainly was not until after the time of Blackstone, because he says: “ In contracts likewise for sales, it is constantly understood, that the seller undertakes that the commodity he sells is his own, and if it proves otherwise, an action on the case lies against him to exact damages for this deceit.” (3 Bl. Com. 165.) It is plain, therefore, that the courts proceeded in these cases upon the ground of presumptive knowledge on the part of the vendor of his want of title.
It has already been shown, to some extent, that implied warranties as to quality, are based, when thejr exist at all, upon the same assumption; but this will further appear from some of the exceptions to the common-law rule •of caveat pmptor. One of these exceptions, which has been generally recognised, is, that upon the sale of pro-, visions, which are purchased, not for the purpose of resale, but to be consumed by the purchaser, there is an implied warranty that such provisions are sound and wholesome. There are two cases in our own courts which show the foundation of this exception. The first *s °f * Van Bracklin v. Fonda (12 Johns. 468), which was an action to recover damages for selling a quantity of beef as'“ good and sound,” which proved “bad and unwholesome.” There was, in that case, some evidence that the defendant knew the animal to be diseased, before it was slaughtered; but the court, in giving judgment, say, that “in the sale of provisions for domestic use, the vendor is hound-to know that they are sound and wholesome, at his peril.”[1] Although what the court *603 here says is, that the vendor is hound to know the condition of what he sells, yet, the subsequent case of Moses v. Mead (1 Denio 378), which was more elaborately considered, shows clearly that the doctrine rests upon a presumption of knowledge on his part. The sale, in that case, was of 194 barrels of mess beef, which proved to be tainted; and the action was assumpsit, founded upon an implied warranty of soundness. The beef was bought, not for immediate consumption, but by merchants, for the purpose of being resold. Mr. Mann, who arg-ued for the defendant, did not dispute the general rule, but relied upon the fact that the purchase was not for consumption; The pith of his argument was in this sentence: “ Where the sale is by wholesale, the vendor has no more opportunity of knowing their quality (the quality of the provisions sold) than the purchaser.” In giving judgment for the defendant, the court proceeded upon this ground, as is evident from the following language of Bronson, O. J. After referring, with approbation, to the case of Van Brocklin v. Fonda, he says:—■“ But there is a very plain distinction between selling provisions for domestic use and selling them as articles of merchandise, which the buyer does not intend to consume, but to sell again; such sales a're usually made in large quantities, and with less of opportunity to Icnoto the actual condition of the goods, than when they are sold by retail.”[2] The implied warranty depends, therefore, in these cases, as in all others, upon the question whether there is reason to impute to the vendor a knowledge of the defects, if any exist.
Another exception to the general rule, which has been recognised in several cases, but with some hesitation and uncertainty, is, that a manufacturer, who sells goods of his own ^manufacture, ■ impliedly warrants that ’ 1 J . they are free from any latent defect growing out *604 of the process of manufacture. In regard to the justness of this exception, it would seem, aside from .authority, scarcely possible to doubt. . If the vendor can be proved to have had knowledge of the defect, and failed to disclose it, all agree, he is liable. Is it not reasonable to presume, that he who made a thing which has a defect arising solely from the manner in which it is made, is cognisant of that defect? Where the vendor has manufactured the article with his own hands, the inference of knowledge would, plainly, in many cases, be strong-enough to charge him, even in an action for fraud. But if the manufacturing is done by agents, the general principles of law would hold the principal responsible for those whom he employs. Wherever the vendor, therefore, has himself manufactured the article sold, or procured it to be done by others, if honesty and fair dealing are ever to be enforced by law, a warranty should be implied. The doubts which have been expressed in one or two cases in this state, upon this subject, could, I think, never have arisen, if the courts had kept steadily in view the principles upon -which implied warranties rest; this would also have prevented the confusion which pervades the early English cases on the subject of exceptions to the maxim caveat emptor.
The 'rule that xipon executory contracts for the delivery' of some indeterminate thing, at a future day, there is an implied warranty that the article shall be of a fair quality and merchantable; the supposed rule that upon the sale of a thing for a particular purpose, there is an implied warranty7- that the thing shall be fit and suitable for that purpose; and the like rule that upon the sale of goods by-sample, the vendor warrants that the goods shall be ■ equal to the sample, have all been treated as exceptions to that maxim.
The first of 'these rules may7-, perhaps, be regarded as, in some sense, an exception, although the case is not one to which the maxim caveat empior could, by possibility, *605 be supposed to apply;[3] but the other two can hardly be considered as exceptions at all. When a person, desirous to obtain an article for a particular purpose, but not being himself skilled in respect to such articles, ^applies to one professing tobe acquainted with the subject, or who, by his occupation, holds himself out to the world as understanding it, and the latter furnishes what he alleges to be suitable, it is plainly to be inferred, that both parties understand the -purchase to be made upon the judgment and the responsibility of the seller. In view of some such case, one or more of the English judges, at an early day, laid down the broad proposition, that, upon the sale of goods for a specified purpose, the law raised an implied warranty, that the goods sold were suitable for that purpose. In Bluett v. Osborne (1 Stark. 384), Lord Ellenborough said:—“A person who sells, impliedly warrants that the thing sold shall answer the purpose for which it is sold.” Lord Tenterden used similar language in Gray v. Cox (4 Barn. & Cress. 108). Best, C. J., reiterated the doctrine, in Jones v. Bright (5 Bing. 533).
But it is obvious, that notwithstanding the goods are sold for a particular use, if the purchaser himself understands what he Avants, and selects" such goods as he deems adapted to the intended use, there is no warranty. There can, therefore, be no such general rule as that referred to; but Avhether there is a Avarranty or not, must depend upon the circumstances of each particular case. This subject has been placed upon its true basis by íavo later English cases, viz., Chanter v. Hopkins (4 Mees. & Wels. 399), and Brown v. Edgington (2 Man. & Gr. 279). In the last of these cases, Tindal, C. J. says:—“ It appears to me, to be' a distinction Avell founded, both in reason and on authority, that if a party purchases an article, upon his OAvn judgment, he cannot afterwards hold *606 the vendor responsible, on the ground that the article turns out to he unfit for the purpose for which it was required; hut if he relies upon the judgment of the seller, and informs him of the use to which the article is to be applied, it seems to me, that transaction carries with it an implied warranty, that the thing furnished shall be fit and proper for the use for which it was designed.”'[4]
This extract shows that these are not cases of implied warranty, in the ordinary sense of these terms. The question is one of fact as to the actual contract between the parties; it is, *on whose judgment and regpoQgPjjiity was the purchase really made? Implied warranties do not rest upon any supposed agree ment in fact. They are obligations which the law raises upon principles foreign to the actual contract; principles which are strictly analogous to those upon which vendors are held liable for fraud. It is for the sake of convenience, merely, that this obligation is permitted to be enforced under the form of a contract. However refined this distinction may appear, its non-observance has led to much of the confusion to he found in the cases on this subject.
■ The same may be said in regard to the doctrine that an implied warranty arises upon every sale by sample; a doctrine, which, with the most obvious propriety, has > jen limited by the recent cases in this state (unless the roods are so situated that they cannot be examined *607 by the buyer) to those cases where the circumstances warrant the inference that the seller actually undertook that the bulk of the commodity sold, corresponded with the sample. (Waring v. Mason, 18 Wend. 425; Hargous v. Stone, 5 N. Y. 73.)[5] In view of the principle settled bjr these cases, it is equally clear, that warranties of this sort, are not strictly implied warranties. They are to be made out as a matter of fact, or they do not exist at all. To infer an actual warranty from the circumstances proved, is one thing; to impute a Avarranty, without proof, is another and different thing, and unless we distinguish between the two, we unavoidably get into confusion.
I will refer to a single case, by way of illustration, viz., Jones v. Bright (5 Bing. 533), a leading case and one frequently cited. The facts were, that the plaintiff purchased from the Avarehouse of the defendant, Avho Avas himself the manufacturer, copper for the sheathing of a ship;' the defendant, Avho Avas informed of the purpose for Avhich the copper Avas wanted, said—“I will serve you Avell;” the copper, in consequence of some defect, lasted only four months, instead of four years, the usual time. Best, 0. J., before Avhom the cause Avas tried, left it to the jury to determine AAdiether the decay in the copper Avas occasioned by intrinsic defect, or external accident; and, if it ""arose from intrinsic defect, Avhether such defect Avas caused by the process of manufacture. Tli.e jury found that the decay Avas occasioned by some intrinsic defect, but that there Avas ‘ no satisfactory evidence as to the cause of that defect. The court held the defendant liable. But there is no little difficulty in ascertaining the precise ground upon Avliich the decision Avas placed. l£ is evident, that the chief justice, when he tried the cause, expected to dispose of it on the ground that the defect in the copper greAV out of the process of *608 manufacture; for he says, in his opinion upon the motion of a new trial:—“I declined expressing an opinion at nisi prius, but I expected the jury would have found that the article was not properly manufactured, for the testimony of the scientific witnesses was very clear.” Still, he does not seem willing entirely to abandon this ground, notwithstanding the verdict rvas against it, for he goes on to remark :■—“ At all events, the warranty given by them (the defendants) is not satisfied, because the jury found that there is an intrinsic defect in an article manufactured by them."
But the chief justice seems to have been driven by the verdict, to seek for some other ground upon which to rest t-lie case; he argues, therefore, to -show that the words “ I will serve you well,” constitute an express warranty; he then adds—“ But I wish to put the case on a broad principle. If a man sells an article, he thereby warrants that it is merchantable, that it is fit for some purpose. * * If he sells it for a particular purpose, he thereby warrants it fit for that purpose.” Mr. Justice Burrough seems to me to have taken the most sensible view of the case; he says—“ I consider this as more a question of fact than of law; the question is whether the contract was proved as laid. It was so proved; and after Fisher had introduced the parties, and stated the purpose for which the plaintiff wanted the copper, the defendants warranted the article, by undertaking to serve the plaintiff well.”
This case has been cited, indiscriminately, to prove that upon the sale of manufactured articles, by the manufacturer himself, there is an implied warranty against defects arising from the process of manufacture; that goods sold for a particular purpose *are warranted fit for that purpose, and even that there is an implied warranty, in all cases of sale, that the goods sold are fit for some purpose. The case, I think, was'properly decidéd, on the ground upon which it was placed by Bur-rough, J. It was this case, more than any other, which has *609 served to create, in the minds of some of our judges, so strong a feeling against exceptions to the maxim caveat emptor, that they have been disposed to reject all such exceptions, without discrimination. (Wright v. Hart, 18 Wend. 449; Hargous v. Stone, 5 N. Y. 73.) But if we look at what the English courts have really decided, instead of what some of the judges have loosely said, we should, I think, find less occasion for deprecating their tendency in this respect, towards the doctrines of the civil law, than has been supposed. . •
But for this hostility to all implied warranties as to quality, it never could have been doubted, that where one sells an article of his own manufacture, which has a defect produced by the manufacturing process itself, the seller must be presumed to have had knowledge of such defect, and must be holden, therefore, upon the most obvious principles of equity and justice, unless he informs the purchaser of the defect, to indemnify him against it. In such cases, if the price paid is entirely below that of a sound article, a presumption rvould, no doubt, arise, as under the civil law, that the purchaser was apprised of the defect. In the present case, a portion of the alleged defect in the saw would seem to have arisen from the unsuitableness of the material of which it was made. The rule on the subject, I hold to be this:—The vendor is liable, in such cases, for any latent defect, not disclosed to the purchaser, arising from the manner in which the article was manufactured; and if he, knowingly, uses improper materials, he is liable for that also; but not for any latent defect in the material which he is not shown and. cannot be presumed to have known.
The judgment should be reversed, and there should be a trial, with costs to abide the event.
Judgment reversed, and new trial awarded.[6]

 And see, to the same effect, Divine v. McCormick, 50 Barb. 116; Burch v. Spencer, 15 Hun 504; and McNaughton v. Joy, l W. N. C. 470.

 Followed in Hyland v. Sherman, 2 E. D. Sm. 234; and see Goldrich v. Ryan, 3 Ibid. 324.

See Edwards v. Hathaway, 1 Phila. 547, per Sharswood, J., now chief justice of Pennsylvania.

 A warranty of the fitness of an article for a specific purpose, cannot bo implied, from a knowledge on the part of the vendor, that it was intended for such purpose. Bartlett v. Hoppock, 34 N. Y. 118. And see Dounce v. Dow, 64 Ibid. 411; Prentice v. Dike, 6 Duer 220; Port Carbon Iron Co. v. Groves, 68 Penn. St. 149. It is only where an article is contracted for, to he applied to a particular purpose, and in such manner, that the buyer necessarily trusts to the judgment or skill of the manufacturer or dealer, and not to his own,.that there is an implied warranty that it shall he reasonably fit for the purpose to which it is to be applied. Charlotte, Columbia and Augusta Railroad Co. v. Jesup, 44 How. Pr. 447.

 A sale by sample, without more, is not a warranty of quality; it merely imports that the goods to be delivered shall follow its kind, and that they shall be merchantable. Boyd v. Wilson, 83 Penn. St. 319.

 On a subsequent trial of this case, there was a verdict for the plaintiff for $10.84, the value of the material only; 24 How. Pr. 26, which was *610 affirmed on appeal; 36 N. Y. 93. In the case of Sanborn v. Herring, 15 Am. L. Reg. 457, it was ruled by Mr. Justice Noah Davis, at circuit, that if a manufacturer of iron-safes, who keeps them for sale, sell one as burglar-proof, there is an implied warranty that it is burglar-proof, so far as it could be made, in the then known state of tke art; and that, on a breach of the warranty, the purchaser was entitled to recover the difference in value between the article as sold, and as what it was represented to be. And see Walker v. Milner, 4 Fost. & Fin. 745, for a similar case, in an English court.